### ELIAS W. GODDARD *vs.* WILLIAM T. SMITHETT & others.

*It seems*, that a religious society is not a private corporation, within the meaning of *St.* 1852, *c.* 312, § 42, authorizing any person whose private right or interest is injured or put in hazard, by the exercise, by any private corporation, or any persons claiming to be such, of a franchise or privilege not conferred by law, to apply to this court for leave to file an information in the nature of a *quo warranto*.

*It seems*, that the irregular and illegal exercise by a private corporation, or persons claiming to be their officers, of a franchise conferred by law, does not render them liable to an information, on the application of an individual, under *St.* 1852, *c.* 312, § 42.

The illegal sale of property of a private corporation, or the illegal laying of a tax upon the members, by persons claiming to be officers of the corporation, does not entitle a member to apply to this court under *St.* 1852, *c.* 312, § 42, for leave to file an information.

Independently of *St.* 1852, *c.* 312, § 42, an individual has no power to apply to this court, without the intervention of the attorney general, for leave to file an information in the nature of a *quo warranto*.

SHAW, C. J. This is a petition for leave to file an information against various persons, as wardens, vestrymen and other persons exercising office in the parish or religious society known as the Proprietors of Christ Church in Boston. It is a petition founded on the provisions of *St.* 1852, *c.* 312, § 42, for leave to file an information, in the nature of a writ of *quo warranto*.

We have had very little aid from judicial precedents in coming to the true construction of this statute, because few cases have arisen under it, or under the corresponding provisions of

the practice act of 1851, which in this respect was exactly like the one under consideration. On examination, we are inclined to the opinion that it is much more limited in its operation, and the objects it is intended to reach, than might be supposed upon a cursory examination.

The provision is, that " any person whose private right or interest has been injured, or is put in hazard, by the exercise, by any private corporation, or any persons claiming to be a private corporation, of a franchise or privilege not conferred by law, whether such person be a member of such corporation or not, may apply to the supreme judicial court for leave to file an information in the nature of a *quo warranto.*" *St.* 1852, *c.* 312, § 42.

It will be perceived that the cases, in which this proceeding by petition for leave to file an information is authorized, are extremely limited. The statute applies to private corporations, or to a number of persons associated together, and claiming to be a private corporation. It does not lie to correct irregularities, nor to afford redress generally for the unlawful acts and doings of such corporations, or persons claiming to be corporations, but lies only when they are exercising a franchise or privilege not conferred by law, by means of the exercise of which franchise or privilege the private right or interest of any person is injured or put at hazard.

Without undertaking to define to what species of corporation or pseudo-corporation alone this statute applies, or laying down any exact rule in regard to the franchise to be exercised, we may safely infer from its terms the nature of the mischief intended to be reached by its provisions.

The State of Massachusetts is eminently a community of corporations. In many of these corporations, individual members and stockholders are made personally liable, to an unlimited amount, for the debts and obligations of the corporation. There are cases, therefore, in which individual persons, members as well as others, may be rendered largely and personally liable by the unauthorized acts of such corporations or aggregate bodies ; as, for instance, if a number of persons are incorporated with

the franchise of opening a road, or building a bridge, or estab-
lishing a ferry, in one place, and they establish it in another; or
if a manufacturing corporation, established for the purpose and
vested with the franchise of manufacturing cotton goods, should
exercise the franchise of banking.

That such was the general purposes of this statute is further
manifest from the report of the commissioners who drafted it,
stating the grounds on which they recommended it to the legis-
lature.   They say: " The facility with which corporate privi-
leges are conferred, the magnitude of the interests which they
involve, the tendency which exists to disregard the limits of their
franchises, and the effect upon the rights and interests, both of
their own stockholders and third persons, of an abuse or excess
of their powers, render it important that some more efficient
remedies should be put into the hands of those who may be
injured."   Commissioners' note to § 71, Hall's Mass. Pract. 184.

With these general views of the purposes and provisions of
the statute, we proceed to examine the case before us.

The applicant sets forth that he and others, of the parish or
religious society known as the Proprietors of Christ Church in
Boston, were duly organized on the 24th of May last, according
to the statute.   By this allegation, we understand that the said
proprietors, an old religious society, having through some infor-
mality in their meetings or choice of officers failed to continue
their regular organization, were reorganized under the statute,
by a meeting called by a warrant of a justice of the peace; and
no question is made that this organization was regular.   The
applicant avers that said corporation was legally established, and
entitled to hold and enjoy all the franchises, powers and privi-
leges of a religious society, under the laws, undisturbed, and that
he is one of the proprietors of said church, and one of the mem-
bers of said corporation.

He then alleges that at an adjourned meeting John Bacon
and others named were chosen vestrymen, but that the full
number was not chosen, nor a quorum competent to act; with-
out alleging what number, or by force of what by-law a full
number of vestrymen should be chosen.

Goddard *v.* Smithett & others.

Without following the petition particularly, it is sufficient to state that he proceeds to allege acts of this body of vestrymen, and particularly the election of Smithett to be rector, and Coffin clerk, and the execution of deeds of pews to other persons, and alleges these to be illegal; and that a meeting of the parish was afterwards called and held on the 7th of September, illegally, at which votes were passed, money appropriated, pews taxed, including that of the applicant, and delegates chosen to an Epis copal convention, all of which the applicant avers to be illegal.

He also alleges that Mair and Sampson, two of the respondents, had intruded themselves into the office of wardens, and Smithett and others into the office of vestrymen, to which they were respectively chosen.

The application goes on to state that Mair and others claim to be the wardens and vestry of Christ Church, and as such to be a body corporate, separate and distinct from the church or religious society, under a special act passed January 30th 1789, (*St.* 1788, *c.* 42,) and another act passed April 4th 1849, (*St.* 1849, *c.* 71,) and to exercise the powers and privileges conferred by these acts.

If this religious society had continued to stand exclusively upon the former of these acts, it would have afforded more color to the claim that the wardens and vestry formed a corporation distinct from that of the society. After certain recitals, it declared that the wardens and vestrymen (named) and their successors should be deemed so far a body corporate as to sue for taxes due upon pews, and other debts due to the said church, of whatever kind, and to sue and defend actions. Section 2 authorized them to sell and lease lands, in the name and behalf of the said church, agreeably and in conformity to the votes of the proprietors.

But the second of the special acts cited so far modifies the former as to invest the rector, wardens and vestry of Christ Church with the rights and powers given to like officers of all churches and religious societies by the Rev. Sts. *c.* 20, notwithstanding any thing to the contrary in the former act. We are therefore to consider this church as a parish and religious society, consti-

tuted like all other Episcopal churches in this commonwealth. In this respect, it is itself a corporation constituted of proprietors, with officers, having the usual and common franchises and powers of all religious societies, as fixed by law.

Taking this to be a parish and religious society, duly constituted, and taking the facts as set forth in the application, the court are of opinion that it is not a case, within the provisions of the act relied on, for filing an information, at the relation of the applicant, in the nature of a *quo warranto.*

In the first place, we are strongly inclined to the opinion that a religious society is not a private corporation within the meaning of the statute. Whether any religious society may be so constituted as to come within it, it is not necessary now to decide.

But again, the court are of opinion that this corporation have not exercised or claimed to exercise any franchise or privilege not conferred on them by law. They have claimed the right as a corporation to organize and choose officers, to elect a rector, to assess and collect a tax on pews, and to choose delegates to an Episcopal convention ; all of which are peculiarly franchises and privileges incident to an incorporated religious society ; and the exercise of these therefore is not a usurpation of franchises or privileges not conferred by law.

It is true that the applicant alleges that these acts were done irregularly, at meetings not duly warned or held, and that the doings were illegal. But in applying this law to a particular case, we must be careful to distinguish between the usurpation of a franchise or power not granted, and the informal, irregular and even illegal mode in which the business of a corporation is conducted. Were it otherwise — were every wrong act of a corporation, or of the officers and managers of the affairs of a corporation, to be held a usurpation of powers not granted, this court must be called upon to revise the acts and doings of every religious society, and of the officers, committees and other delegated bodies, acting under and for every religious society, to decide whether they are regular or not.

But there is another consideration, whether we are correct in

the foregoing views or not, which we think decisive against the allowance of the claim of the petitioner, and that is, that he has no private right or interest which has been injured or put at hazard by the alleged misconduct of the corporation or its officers, for which he has not an adequate and complete remedy. The interest which he has as a parishioner and proprietor is one in common with all the other parishioners and proprietors. He avers that his interest as a proprietor is injured by the sale of pews. It may be remarked, in passing, that if there were pews in the hands of the society unsold, it was for the common interest of all the proprietors that they should be sold to suitable and proper persons; and that thereby the corporation as a religious society would be strengthened and benefitted, both in numbers and resources. But even if they were sold illegally, or sold too low, it was not an injury to the applicant in his private rights, but one sustained by the whole body, and by every member of it.

The only distinct injury to a private right of the applicant is, that the tax said to be illegally laid, or laid at a meeting illegally held, was assessed upon all the pews, and upon that of the applicant with the rest, and that he is in danger of having the payment of such tax enforced in some of the modes provided by law. But we are of opinion that he has a better remedy than any information would afford him against such danger. He alleges that the tax laid on his pew is illegal. If, under a warrant of distress, the collector should attempt to coerce payment, or if, by any by-law or regulation, any officer should offer his pew for sale, to raise money sufficient to pay said tax, he has only to pay his tax, under a protest against the legality of such tax, and in order to save his property from loss; and if he can show the tax to be illegal, he may recover back the money in an action at law. If it is not illegal, his complaint is ill founded.

In this petition there is a clause praying for leave to file an information in the nature of a *quo warranto*, calling upon Smithett and others to show by what right they held the meeting of the 7th of September and chose officers, and assessed taxes, and made appropriations; calling on Mair and Sampson

to show by what authority they have intruded themselves into the office of wardens; calling on Smithett and others to show by what authority they have intruded themselves into the offices to which they were respectively elected at said meeting; calling on Pulsifer and others to show by what authority they, being less than a quorum and otherwise illegally acting, claim the right of organizing as the vestry, making deeds of pews, and calling meetings; and calling on said wardens and vestry to show by what authority they exercise the powers of that body under the acts referred to, and other laws of the Commonwealth.

If this is intended as an application for leave to file an information, under any other provisions of law than those found in the new practice act of 1852, already considered, we are of opinion that it cannot be allowed.   Even were it an application at common law, to authorize and direct the proper officer of the crown, at the relation of an individual, to file an information for the special use and benefit of one claiming a corporate office, into which another is alleged to have intruded, according to the practice in the court of king's bench, this application could not be sustained.   It has been repeatedly decided in England, under the old common law, authorizing the proper officer of the crown to file an information in the nature of a *quo warranto* at the relation of a party, that it will not lie for a corporate office, except of a public nature, such as the offices in cities or other municipal corporations, which concern the public or the administration of justice.   It will not lie to try the validity of the election of a church warden, or overseer of the poor, or other like parish officer Without referring to original authorities, it may be sufficient to refer to a recent treatise on this subject.   Cole on Informations, 162.

But independently of this consideration, we are not aware of any authority in this court to entertain an application as in the king's bench, and grant or withhold license to file a criminal information, except that conferred by the statute above mentioned, and perhaps by special provisions in a few other cases.

There is, and always has been, in this commonwealth, an authority in the attorney and solicitor general, as incident to

the office, to file informations *ex officio* in the name and behalf of the Commonwealth. The information is in its nature a prosecution for some offence against the government, by an application to a court of criminal jurisdiction, and is essentially a public criminal prosecution. When filed by the attorney general, it is done at his own discretion, according to his own view of the rights of the government, without leave of court, nor will the court direct or advise him on the subject.

But in England the court of king's bench having a general superintending control over the criminal jurisdiction of the whole kingdom, there is attached to the crown side of that court a department denominated the crown office ; at the head of this department is an officer of the crown, known as the king's coroner and attorney, commonly called the master of the crown office. This officer has authority to file informations in the name of the king in suitable cases ; and, being at the same time an officer of the court, and subject to their orders and directions, the practice has been for individuals, specially affected or injured by any usurpation of office, or other wrong or injury to the public, to file in court an application for a direction to the master of the crown office to file an information, with a view to redress the public wrong of which the relator complains, whereupon the relator is required, as the public never pay costs on failure of a public prosecution, to give security to the party complained of, for costs, if the prosecutor should not prevail. Upon such application, the court usually order a notice to the party complained of, to appear and show cause, and if, on appearance, probable cause is shown, the usual course is, to direct the master of the crown office to file an information, at the suit of the king, but naming the relator, after which it is conducted by the relator at his own expense, very much in the nature of a civil suit.

So familiar and well understood is this practice in England, that in speaking of an application to the court of king's bench for leave to file an information, it is always intended an information at the relation, and for the benefit of the applicant, to be filed in the name and behalf of the crown, by the master of the

crown office. An information by the attorney general *ex officio* is filed on his own authority, and usually for a very different class of violations of public right, though both are public prosecutions, instituted by acknowledged and authorized public officers.

But there being no corresponding office or officer in this commonwealth, having authority at common law to prosecute in the name and behalf of the public, and at the same time an officer of this court and subject to its orders and directions, no corresponding practice could prevail here.

We have thought it the more necessary to dwell somewhat upon this point, because we find that the respectable commissioners who reported the practice act, part of which we have been considering, have introduced a sentence, seeming to imply a different understanding on their part. Hall's Mass. Pract. 184. It is § 50 of the present act of 1852, § 64 of the act of 1851, or § 71 as reported by the commissioners. After providing that nothing in the act shall affect the duty of the attorney general hereafter to proceed *ex officio*, they add " nor to deprive any individual of the right to file an information respecting the election or admission of an officer or member of a corporation." And they cite *Commonwealth* v. *Union Fire & Marine Ins. Co.* 5 Mass. 230. And that case, as the report stands, certainly gives color to this view, and requires particular notice.

We are not aware that it was ever in the power of an individual, at common law, on his own authority and at his own will, without the intervention of any prosecuting officer, or without the order of court, to file an information in the nature of a *quo warranto*, respecting the admission or election of an officer or member of a corporation. We suppose, therefore, the section should read " to deprive any individual of the right to apply to a competent jurisdiction, to grant him an information," &c., meaning in this respect to leave the law as it stood before, whatever it was.

The case of *Commonwealth* v. *Union Fire & Marine Ins. Co.* 5 Mass. 230, contains expressions by Chief Justice Parsons, seeming to imply that informations are properly grantable for

some purposes, when moved for by any person interested in, or injured by an election or admission to office, if the same was unduly made. But it is manifest from the object of the suit, which was to obtain a judgment of forfeiture against the corporation, that the learned chief justice was speaking of the mode of proceeding at common law, and did not refer to the practice of this commonwealth. It is quite consistent with what is stated in the report, that he explained the difference between an information *ex officio* filed by the attorney general, and an information filed by leave of the court of king's bench, by the master of the crown office, in the name of the king, at the relation of an individual specially injured, and the different cases to which these respective modes of proceeding were applicable. And it is quite certain that the only case cited by the chief justice, *Rex* v. *Carmarthen,* 2 Bur. 869, turns wholly upon that distinction.

In *Commonwealth* v. *Waterborough,* 5 Mass. 257; *Commonwealth* v. *Dearborn,* 15 Mass. 125; and *Commonwealth* v. *Fowler,* 10 Mass. 290, the informations were filed by the attorney general or solicitor general *ex officio.* In *Commonwealth* v. *Athearn,* 3 Mass. 285, the hearing was *ex parte,* and no question was made how or by whom the prosecution should be commenced and conducted. It is manifest that this court understood that in some form they had the power.

There is no doubt that, as the attorney general has authority in all cases of violation of public right to file an information, he may do so, in case of a usurpation of office, as well as in any other. And if there be no other mode by which such question could be conveniently tried and determined, the attorney general would no doubt more freely exercise that power in behalf of an injured individual than in a case where he has a plain remedy in his own power. The question is, as to the right of an individual, without the aid or permission of the attorney general, when he cannot find the power specially given by statute.

This court being vested with all the power and jurisdiction of the king's bench over crimes and offences, with power to direct all proper process, it would seem not inconsistent with the general powers and practices of the court, to assume and

exercise the power of directing how and in what form an information might be filed. But it is believed that there is no practice and no precedent to that effect. Being of opinion that the petition is not within the statute, this petition is dismissed.

*J. H. Wakefield,* for the petitioner.

*G. M. Browne,* for the respondents.